**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: 914-874-0710
Facsimile: 914-206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LISA TSERING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRIPLE LIFT, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

PAGE


NATURE OF THE ACTION ..... 1

PARTIES ..... 1

JURISDICTION AND VENUE ..... 1

FACTUAL ALLEGATIONS ..... 2

I. DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ..... 2

A. Data Brokers ..... 2

B. Real Time Bidding ..... 6

C. Cookie Syncing ..... 12

II. AN OVERVIEW OF DEFENDANT'S SERVICES ..... 16

A. TripleLift ..... 16

B. TripleLift's Online Targeting and Tracking Technology ..... 17

C. The TripleLift Tracker's Collection Of Persistent Identifiers And User Communications ..... 20

1. Cookies ..... 20

2. IP Addresses ..... 20

3. Universal Resource Locator ..... 23

4. Mobile Advertising Identifiers ..... 24

5. Other Identifiers ..... 28

D. TripleLift's Identity Resolution ..... 30

E. TripleLift Audiences ..... 31

F. TripleLift's "Server-to-Server" User Syncing ..... 33

III. DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES ..... 35

A. Accuweather ..... 35

B. Healthline ..... 39

C. Loan Depot ..... 43

D. Zillow ..... 45

IV. DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS ..... 48

A. Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users ..... 48

B. The Partner Trackers Use Profiles Created By Defendant To Enhance Their Advertising And Analytics Services ..... 49

PLAINTIFF'S EXPERIENCES ..... 50

A. Plaintiff Lisa Tsering ..... 50

CLASS ALLEGATIONS ........ 51
CAUSES OF ACTION ........ 53
COUNT I ........ 53
COUNT II ........ 55
COUNT III ........ 58
COUNT IV ........ 60
COUNT V ........ 61
PRAYER FOR RELIEF ........ 64
JURY TRIAL DEMANDED ........ 64

Plaintiff Lisa Tsering ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Triple Lift, Inc. ("TripleLift" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegation specifically pertaining to herself, which are based on personal belief.

## NATURE OF THE ACTION

1. This class action lawsuit sets forth how TripleLift surveils of millions of Americans through their activity on the Internet and mobile applications. TripleLift, through its software products, tracks in real time and records indefinitely the personal information and specific web activity of users of an unknown number of websites and apps.

2. This unlawfully collected information is worth hundreds of millions of dollars to Defendant because it makes up the content of Defendant's "TripleLift Audiences" and creates individual sales of advertisements in the real-time-bidding ecosystem present on websites where Defendant's services are installed.

3. Plaintiff brings this action to enforce her constitutional right to privacy and to seek damages under Federal and California law for the harm caused by the collection and sale of her confidential data and personal information.

## PARTIES

4. Plaintiff Lisa Tsering is a natural person and citizen of California, residing in El Cerrito, California. Plaintiff Tsering was in California when she accessed the Healthline and Zillow websites and had her activity on those websites and subsequent activity on other websites tracked by Defendant.

5. Defendant Triple Lift, Inc., is a Delaware corporation with its principal place of business at 53 23rd Street, 12th Floor, New York, New York 10010. TripleLift is a supply-side platform and ad exchange for buyers and sellers of web ads to make instant transactions.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class

are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

7. This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff Tsering resides in this District.

## FACTUAL ALLEGATIONS

### I. DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY

9. To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

10. As a preliminary matter, TripleLift acts as a data broker and operates as a Supply-Side Platform (SSP)[1] and an ad exchange, as explained in further detail *infra*.

#### A. Data Brokers

11. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[2] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

12. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise

[1] *TripleLift SSP, Premium Inventory Without Compromise*, TRIPLELIFT, https://triplelift.com/triplelift-ssp.

[2] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, DUKE SANFORD CYBER POLICY PROGRAM, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

shar[ing] the data with third parties."[3] Such databases are extensive, and "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[4]

13. For instance, as a report by NATO found, data brokers, like Defendant, collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited.[5] Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[6] On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[7]

14. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[8] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[9]

15. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and

---

[3] *Id.*

[4] Tehila Minkus et al., *The City Privacy Attack: Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM CONFERENCE ON ONLINE SOCIAL NETWORKS, at 71, (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[5] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[6] *Id.*

[7] *Id.*

[8] Sherman, *supra* note 6, at 1.

[9] *Id.*

Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[10]

16. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[11]

17. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[12]

---

[10] *Id*. at 9.

[11] *Id*.

[12] Twetman & Bergmanis-Korats, *supra* note 9, at 8.




18. Data brokers, like Defendant, are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[13] Indeed, as McAfee (a data security company) notes, "data brokers … can even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[14]

---

[13] *Id*. at 11.

[14] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE, (Jan. 28, 2025), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

19. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[15]

20. In short, data brokers like Defendant track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

**B. Real Time Bidding**

21. Once Defendant collects information from consumers and create comprehensive user profiles, how does Defendant "sell" or otherwise monetize that information? This is where real-time bidding comes in, and Defendant, as an ad exchange, facilitates it.

22. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which users will be shown a particular digital ad on a website or application."[16]

23. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."[17] An SSP "work[s] with website or app publishers to help them participate in the RTB process."[18] "DSPs primarily work with advertisers to help them evaluate the value of [showing a user an ad] and optimize the [] prices

---

[15] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS, (May 10, 2022), https://usefathom.com/blog/data-brokers.

[16] Sara Geoghegan, *What is Real Time Bidding?,* ELECTRONIC PRIVACY INFORMATION CENTER, (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[17] *Id.*

[18] *Id.*

they [bid for those users]."[19] And an Advertising Exchange facilitates the exchange of information between advertisers and publishers as well as the sale of ad placements via real-time bidding.[20]

24. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens. Defendant plays crucial roles in this process as a data broker, an SSP, and an Advertising Exchange.

25. The RTB process works as follows:

26. After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device **identifiers, IP address, zip/postal code, GPS location, browsing history, location data**, and more. After receiving the bidstream data, an Advertising Exchange will **broadcast the data to several DSPs**. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

27. Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But **even the losing DSPs still benefit because they also receive and collect the user data** broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[21]

---

[19] *Id.*

[20] Brock Munro, *What is an Ad Exchange and How Does It Work*, PUBLIFT, (Feb. 28, 2025), https://www.publift.com/blog/what-is-an-ad-exchange.

[21] Geoghegan, *supra*; *see also How does Deal-time Bidding (RTB) Work?*, SETUPAD, https://setupad.com/blog/real-time-bidding/ (emphasis added).




28. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for websites and app operators' users. SSPs and DSPs integrate with Data Management Platforms ("DMPs") or data brokers like Defendant to infer the identities of users based on alternative data sources:

29. Further:

> The economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP). DSPs send bid requests to DMPs, who enrich them by attempting to **identify the user in the request and use a variety of data sources**, such as [information provided by the website or app operator,] uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP also wins the **right to cookie sync** its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[22]

[22] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey (emphasis added).




30. In other words, before bidding to show a user an advertisement, a DSP will attempt to determine what other information about a user may be available. A DSP does this by connecting with entities like Defendant, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address and unique device information) with any data about those users that Defendant already has. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on, including in some cases the actual identities of users. This naturally enriches website and app operators, as their users are now more valuable. And, a DSP is able to continue linking users on a website or mobile application through the Advertising Exchange, which enhances the DSP's ability to better identify users in the future and helps the DSP profit further as well.

31. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

- "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
- "send[ing] sensitive data across geographic borders."

- sending consumer data "***to potentially dozens of bidders simultaneously***, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[23]

32. The last point bears additional emphasis, as it means the data Defendant provides to DSPs to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This practically eliminates the ability of users to control their personal information.

33. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[24]

[23] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FEDERAL TRADE COMMISSION, (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[24] Geoghegan, *supra*.

34. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[25]:




35. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

36. To summarize the preceding allegations: website and mobile application operators monetize their platforms through the use of real-time bidding. Through this process, consumer information is provided to advertisers. Advertisers then "bid" to show consumers an advertisement, with the winning bidder ultimately having their advertisement displayed to consumers. However, all participating advertisers receive all of the consumers' information regardless.

---

[25] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

37. The value of those users is enriched by partnering with data brokers, data management platforms, and advertising exchanges, like Defendant, which enable the entities involved in RTB to link the information collected from consumers on a particular website or app with Defendant's vast repository of user data that Defendant maintains on billions of consumers. This enriches the value of a website or app's user base because advertisers will pay more to show ads to users they can identify and know more about.

38. Defendant also operates as the advertising exchange and SSP on thousands of websites, sharing the information collected on millions of Americans with advertisers, SSPs, and DSPs to facilitate hyper-targeted advertising to individuals.

39. Defendant benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information it has about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

40. Defendant is already one of the largest players in this industry. Defendant achieved this status through the use of a variety of technologies and services, as described below.

**C. Cookie Syncing**

41. It should now be clear both the capabilities of data brokers who de-anonymize users, and the reasons that Defendant's technology is installed on websites (to provide more information to advertisers in real-time bidding. The final question is how does Defendant share information with other services to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

42. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[26]

---

[26] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other['s] cookies, in order to better facilitate targeting and real-time bidding."[27]

43. Cookie syncing works as follows:

44. Let us assume a user browsing several domains like **website1.com** and **website2.com**, in which there are 3rd-parties like **tracker.com** and **advertiser.com**, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, **tracker.com** knows the user with the ID **user123**, and **advertiser.com** knows the same user with the ID **userABC**.

45. Now let us assume that the user lands on a website (say **website3.com**), which includes some JavaScript code from **tracker.com** but not from **advertiser.com**. Thus, advertiser.com does not (and cannot) know which users visit **website3.com**. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to* ***tracker.com*** *(step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …
> When **advertiser.com** receives the above request along with the cookie ID userABC, it finds out that userABC visited **website3.com**. *To make matters worse,* ***advertiser.com*** *also learns that the user whom* ***tracker.com*** *knows as* ***user123****, and the user* ***userABC*** *is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit **website3.com**, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[28]

[27] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

[28] Papadopoulos, *supra*, at 1433.




46. Through this process, third party trackers like Defendant are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[29]

[29] Papadopoulos, *supra*, at 1434.

47. On the flip side, "CSync may re-identify web users even after they delete their cookies."[30] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[31] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address or device information), "then through CSync, all of them can link the user's browsing histories from before and after [the user clears their browser history]. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[32]

48. Thus, "syncing userIDs of a given user increases [their] identifiability while browsing, thus reducing their overall anonymity on the Web."[33]

49. Cookie syncing is precisely what is happening in this case. When Defendant's cookies are installed on users' browsers, they are syncing users' unique identifiers with other third parties on the websites to develop a more fulsome picture of the user based on information from multiple platforms (*e.g.*, the Partner Pixels listed below). The result of this process is not only that the user is identified by multiple third parties, but also that those parties share information with each other about the user for targeting in the future. The cookies contain unique identifiers, and the third parties share users' cookie data with each other. This prevents users from being anonymous when they visit websites.

* * *

50. To summarize the preceding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles. Through "cookie syncing" and other methods, those profiles are shared by Defendant with other entities (and vice versa) to form the most fulsome picture of internet users with as much data as possible. Those profiles are offered up for sale to advertisers through real-time bidding, where

---

[30] *Id.*

[31] *See id.*

[32] *Id.*

[33] *Id.* at 1441.

advertisers will pay higher prices for user profiles with more detailed, identifying information. Thus, Defendant enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

51. Accordingly, Defendant is using the Tracker in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing Defendant's Trackers and allowing the Defendant to collect as much information about users as possible (without consent).

52. Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

## II. AN OVERVIEW OF DEFENDANT'S SERVICES

### A. TripleLift

53. Defendant TripleLift was founded in 2012 by Eric Berry, Ari Lewine and Shaun Zacharia as a "real time bidding network for native ads."[34] TripleLift was acquired by Vista Equity Partners for $1.4B in 2021.[35]

54. TripleLift describes itself as the "Creative SSP" covering multiple advertising formats "[f]rom web to [internet-connected TV] and retail media", providing advertisers with consumers and "empowering publishers to maximize revenue."[36] As an SSP, TripleLift works with "99% of the top publishers globally," helping them place advertisements on their websites.[37] As an ad exchange, TripleLift uses those advertisements to offer "billions of [user views] across trusted

---

[34] *TripleLift*, FORBES, https://www.forbes.com/companies/triplelift/.

[35] Ronan Shields, *TripleLift to Sell Majority Stake to Vista Equity Partners for $1.4 Billion*, ADWEEK, https://www.adweek.com/media/triplelift-to-sell-majority-stake-to-vista-equity-partners-for-1-4-billion/.

[36] *The Marketer's Building Blocks For Success*, TRIPLELIFT, https://triplelift.com/resources/playbook/the-marketers-building-blocks-for-success-creative-technology-in-programmatic-advertising/.

[37] *TripleLift SSP*, TRIPLELIFT, https://triplelift.com/triplelift-ssp/.

content" for advertisers to purchase in the real-time bidding process.[38] In 2022, TripleLift acquired a company called 1plusX to boost its ability to identify users online.[39]

55. It is estimated that TripleLift collected information on 0.83% of all web traffic, including on 1,603 of the top 10,000 most-visited websites.[40]

### B. TripleLift's Online Targeting and Tracking Technology

56. TripleLift claims to combine "actionable data, advanced targeting, and premium inventory, [to] empower publishers and brands to discover new opportunities, achieve measurable outcomes, and engage audiences seamlessly across every platform."[41] In practice, TripleLift is an SSP and ad exchange that enables website operators to sell their user inventory to interested advertisers.

57. TripleLift, as a programmatic ad exchange,[42] helps advertisers "combine the power of [first party data], [third party data identifiers] and unique curation capabilities to seamlessly reach [their] target audiences without reliance on legacy identifiers."[43]

58. Programmatic advertising enables advertisers and their agents to select among criteria to deliver targeted messages to preferred audiences. TripleLift manages the competing bids submitted by the bidding entities and facilitates the display of an ad associated with the winning bid.

---

[38] *Id.*

[39] *TripleLift Has Acquired 1plusX*, TRIPLELIFT (Mar. 21, 2022), https://triplelift.com/press/triplelift-acquired-1plusx/.

[40] https://www.ghostery.com/whotracksme/trackers/triplelift.

[41] CREATIVE THAT PERFORMS, TRIPLELIFT, https://triplelift.com/about/.

[42] Dan Hughes, *The Beginner's Guide to Programmatic Advertising*, DIGITAL MARKETING INSTITUTE (Mar. 11, 2024), https://digitalmarketinginstitute.com/blog/the-beginners-guide-to-programmatic-advertising#heading_52480 ("Programmatic ad buying is the use of software to buy digital advertising. While the traditional method includes requests for proposals, tenders, quotes, and negotiation, programmatic buying uses algorithmic software to buy and sell online display space.").

[43] *Data & Targeting*, TRIPLELIFT, https://triplelift.com/data-targeting/. First-party data is data that websites "collect directly from [their] customers," while third-party data is data that is "acquire[d] from a data aggregator" that does "not collect data directly but obtain[s] it from other companies and compile[s] it into a single dataset." WHAT IS THE DIFFERENCE BETWEEN FIRST-PARTY, SECOND-PARTY AND THIRD-PARTY DATA?, CUSTOMER DATA PLATFORM RESOURCE, https://tinyurl.com/2htc6a8n.

59. For advertisers, TripleLift's "data & targeting technology, TripleLift Audiences, ensures [advertisers] reach the right audience with a robust library of audience segments, optimizing toward your desired KPIs."[44] For publishers (*i.e.*, website operators), TripleLift promises to "[u]nlock new revenue opportunities and drive incremental dollars effortlessly."[45]

60. TripleLift specifically discusses its real-time bidding capabilities, noting it can provide "the most competitive price" for user inventory and "[d]ynamically adjust bids to reach the most relevant audiences."[46]

61. To support this process, TripleLift collects "Online identifiers", "Content consumption data", "Ad consumption data", "Inferred personal aspects data", "Ground-truth data", "Network and connection data", "Precise location data", and other types of data, either directly through its own tracking pixels or as provided by its partners.[47]

62. TripleLift receives data wherever its technology is implemented by a publisher or advertiser.[48] It also collects information from "partners and vendors that provide data products or services to TripleLift", which may include advertisers, identity providers that know who a user is, and other Data Management Platforms (DMPs), separate from websites where an internet user may visit and become aware of the data tracking.[49] By exchanging information with other data brokers and DMPs both on the client-side and server-side, TripleLift opens up the possibility to receive and process data about users who never directly interacted with TripleLift, nor with any publisher or advertiser who directly contracts with TripleLift.

63. Once TripleLift's Advertising Partners set up TripleLift as a destination, TripleLift collects information automatically as users access websites and mobile applications. The following excerpt of network traffic from the Bon Appetit website is illustrative, where TripleLift has

---

[44] ADVERTISERS, TRIPLELIFT, https://triplelift.com/advertiser-solutions/.

[45] PUBLISHERS, TRIPLELIFT, https://triplelift.com/publisher-solutions/.

[46] TRIPLELIFT SSP, https://triplelift.com/triplelift-ssp/.

[47] *Platform Privacy Policy*, TRIPLELIFT, https://triplelift.com/platform-privacy-policy/.

[48] *Id.*

[49] *List of Processors and Other Third Parties*, TRIPLELIFT, https://triplelift.com/triplelift-processors-and-other-third-parties/

received bids for an auction for ad space and can be seen connecting to adsrvr.org, scorecardresearch.com, and doubleclick.net, sharing various identifying information about the user, including their unique TripleLift ID ("tluid"), latitude and longitude coordinates, other identifiers, and various details about the web page being visited to inform the auction.




64. Specifically, this transmission shows that TripleLift hosted an auction for a particular sized ad banner and is returning advertising content from the auction winner (in this example, "ketelone.com") along with the Third Party tracker details, all within mere milliseconds.

65. As part of their investigation, Plaintiff's counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by TripleLift. For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.[50]

---

[50] https://www.ghostery.com/whotracksme/trackers/triplelift.

### C. The TripleLift Tracker's Collection Of Persistent Identifiers And User Communications

66. All of the above information is used to identify individuals and track their activity, but persistent identifiers and URL information play particular roles in the advertising tracking and surveillance apparatus.

67. Trackers can monitor individuals across multiple websites is through the use of persistent identifiers. As the name suggests, persistent identifiers are identifying information that follow an Internet user from one website or app to another. Even though a tracker may not explicitly be told that a user of WebsiteA also visited WebsiteB, it can infer that fact based on tracking the consistent appearance of persistent identifiers across the two sites. A tracker may do this in a number of ways.

*1. Cookies*

68. A common form of persistent identifier is a browser "cookie." "Cookies are bits of data that are sent to and from your browser to identify you. When you open a website, your browser sends a piece of data to the web server hosting that website."[51]

69. After the cookie is loaded onto a person's browser, each time that person visits a website where the company that placed the cookie is operating, the company can use the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser. As such, they can track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

70. This information is cross-referenced with other information collected by Defendant to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

*2. IP Addresses*

71. IP addresses are another common persistent identifier.

72. An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The

[51] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2.

traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[52]

73. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

74. IP addresses are not freely accessible. If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

75. IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[53] Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[54]

76. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[55] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[56] Indeed, "IP targeting is one of the most

---

[52] *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ and https://netbeez.net/blog/rfc1918/.

[53] https://iplocation.io/.

[54] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[55] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[56] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[57] because "[c]ompanies can use an IP address … to personally identify individuals."[58]

77. In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[59] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[60]

78. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[61]

79. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[62]

80. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other

---

[57] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[58] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[59] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[60] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[61] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[62] *Id.*

forms of advertising."[63] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[64]

81. "IP address targeting can help businesses to improve their overall marketing strategy."[65] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[66]

82. Putting IP addresses in the hands of a data broker like Defendant is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[67]

83. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[68]

*3. Universal Resource Locator*

84. In addition to collecting myriad identifiers, data brokers and pixel operators also collect the Universal Resource Locator (URL) of the webpages visited by each individual.

85. Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

---

[63] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[68] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

86. Each page on a website has its own individual URL, allowing trackers with access to the URL to see which pages of a website a particular internet user visited, search terms entered by the user when navigating the site, and any tracking tokens appended to the URL by other trackers.

87. All URLs identify the pages of each page of a website an internet user visited.

88. For example, when viewing property on the Zillow website, the property address is included in the URL.




89. As such, any tag that intercepts the URL on this page also intercepts the titles of the content the users view and appended tracking identifiers. This process works similarly on other websites.

*4. Mobile Advertising Identifiers*

90. Defendant employs similar methods to track individuals using mobile apps on Android and iOS devices using identifiers unique to mobile devices.

91. For example, Defendant collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").[69]

92. An AAID is a unique string of numbers which attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across

[69] TRIPLELIFT PLATFORM PRIVACY POLICY, TRIPLELIFT, https://triplelift.com/platform-privacy-policy/.

multiple mobile applications.[70] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

93. Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendants, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers). Byron Tau, MEANS OF CONTROL: HOW THE HIDDEN ALLIANCE OF TECH AND GOVERNMENT IS CREATING A NEW AMERICAN SURVEILLANCE STATE at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices. Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

94. Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[71] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[72]

95. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

96. Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of

---

[70] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

[71] https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[72] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/.

a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[73]

97. As with previously discussed web cookies and the AAID, collection of IDFAs allows trackers to monitor iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, sufficiently permits even an ordinary person to identify a specific individual with the IDFA.

98. Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[74] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.




[73]https://www.appsflyer.com/glossary/idfa/#:~:text=Identifier%20for%20Advertisers%2C%20or%20IDFA,of%20their%20post%2Dinstall%20activity.

[74] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

99. ID Bridging "has long been the foundation of programmatic advertising,"[75] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[76] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[77]

100. ID Bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'" And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[78]

101. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

102. Put simply, ID bridging enables the supply-side to extend user identification beyond the scope of one browser or device.[79]

103. Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the

---

[75] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[76] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[77] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[78] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

[79] *See, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

104. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and TripleLift's, as Defendant):

105. A consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more. It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[80]

106. In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like TripleLift without the knowledge or consent of users, all of which is being done for pecuniary gain.

*5. Other Identifiers*

107. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, data brokers and ad exchanges collect other identifying information that allow them to identify the individual using a device and to add their web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

---

[80] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

108. One method is through collecting hashed e-mail addresses. The logic of this is straightforward. If a data broker collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual. Hashed emails are commonly used as "deterministic identifiers".[81]

109. Although Defendant collects hashed[82] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[83] Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[84] through SHA-256 and/or other hashing algorithms.

110. The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[85]

111. For example, Google informs advertisers who wish to "target[ ] Customer Match segments in [] Google Ads campaigns[]" that "Google keeps track of the email addresses and phone numbers for Google accounts and the corresponding hashed strings for those email addresses or phone numbers."[86] Accordingly, Google can compare "each hashed string on [a given

[81] *See supra* Section I.D., "ID-Less User Targeting".

[82] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[83] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www.pixeldetracking.com/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain

[84] *Id.*

[85] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

[86] GOOGLE, ABOUT THE CUSTOMER MATCHING PROCESS, https://support.google.com/google-ads/answer/7474263.

email] list with the hashed string for email address or phone number of Google accounts[]" to determine "[i]f there's a match[ with a] … corresponding Google account[.]"[87]

112. Thus, even in hashed form, identifiers like email addresses are traceable to individuals.

113. Location information functions in a similar manner. If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to pinpoint a single user over time.

114. HTTP requests, when intercepted by data brokers and pixel operators, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each and will thus identify the user

**D. TripleLift's Identity Resolution**

115. In addition to its own tracking of individuals across the internet, TripleLift sells its tracking and identification services to its Advertising Partners through a process known as identity resolution.

116. "Identity resolution" is the process of utilizing the broad data collection described above, paired with algorithms to "resolve" the true identity of an otherwise anonymous internet user.

117. It is the culmination of TripleLift and its Advertising Partners' tracking, where TripleLift assigns an ID number to an individual so that the individual is attached to every record of their web and app activity for the purpose of targeted advertising. This ID is then shared with TripleLift's Advertising Partners to further enable their targeting as well.

[87] *Id.*

118. The process of identity resolution may involve Cookie Syncing[88], "ID-Less" User Targeting[89], and various combinations of the two. The goal is to identify internet users by any means necessary.

119. With respect to the delivery of targeted advertisements on websites, TripleLift's identity resolution (considering both Cookie Syncing and "ID-Less" User Targeting" makes the entire real-time-bidding process possible by identifying the website visitor and providing information about their web activity and interests. This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator (the Publishers), as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

120. For these processes to happen, TripleLift must necessarily share the information it collects on individual internet users with its partners, and vice versa.

121. The identity resolution service enables in the wiretapping and surveillance conducted by the Advertising Partners.

### E. TripleLift Audiences

122. TripleLift touts its integration with data brokers and other "data partners," which it claims enables "advertisers to reach the right audience with precision. By leveraging first-party and contextual data, we deliver personalized and impactful ad experiences. Our data-driven targeting solutions ensure that your ads reach relevant users, boosting engagement and ROI"[90]:

123. In this context, "first-party data" is any data coming from an entity with which the user is directly interacting, whereas third-party data is any data from a party not directly interacting with the user.

124. TripleLift's data broker integrations power the "TripleLift Audiences" product, which "packages audience segments spanning third-party and first-party data to deliver outcomes

---

[88] *Supra* Section I.C.

[89] *Supra* Section I.D.

[90] PARTNERS, TRIPLELIFT, https://triplelift.com/partners/.

for advertisers today and in a cookieless future."[91] Its use cases include "[a]dvertiser first-party data retargeting based on a known list of consumers."[92]

125. In other words, TripleLift compiles comprehensive user profiles by collecting first-party data from web publishers and warehousing that data together to create vast, cross-publisher profiles of each visitor to a publisher's website. TripleLift uses Machine Learning and Artificial Intelligence to "curate" this data to reconcile the identity of users across websites and infer characteristics about them..[93]

126. TripleLift specifically created its TripleLift Audiences product to "to create cross-site audiences without a reliance on cross-site identity, cookie, or otherwise."[94]

127. To wit, "TripleLift if so confident in the power of first-party data that [it] acquired 1plusX in March of 2022, to build technology that will allow us to package publisher first-party data to target at scale."[95] In response to browsers cracking down on third-party tracking cookies, TripleLift's primary strategy is to replicate that tracking with even more identifiable first-party data from web publishers without relying on cookies.

128. In summary, when any website publisher employs TripleLift to sell ad space, TripleLift collects information on all of the publisher's visitors and mixes them with the visitor data from all other publishers using TripleLift. TripleLift takes this combined data and augments it further with third party data from other data brokers into "curated" audiences. To date, TripleLift has curated "2000+ audiences" that it can identify without the use of legacy IDs, relying instead on its ability to identify users on other "non-ID" attributes, such as hashed emails and browsing

---

[91] SMART DATA & TARGETING FOR ADVERTISERS, TRIPLELIFT, https://web.archive.org/web/20240325054603/https://triplelift.com/products/audiences-advertisers/.

[92] *Id.*

[93] DATA TARGETING, TRIPLELIFT, https://triplelift.com/data-targeting/ (describing "Curated deals" that can identify users based on "age/gender segments, keyword based segments, behavioral segments, [or] purchase-intent segments" implying the existing of dense profiles on website visitors to inform such targeting and "curation").

[94] *Your ID Solution Is Not Enough*, TRIPLELIFT (Mar 13, 2024), https://triplelift.com/resources/blog/id-solution-triplelift/.

[95] *Cookie Deprecation Has Already Begun. Make First-party Data Your MVP*, TRIPLELIFT, (May 9, 2023), https://triplelift.com/resources/blog/cookie-deprecation-has-already-begun-make-first-party-data-your-mvp/.

history.[96] "Instead of [using cookies], [TripleLift] build[s] audience segments with publishers using their first-party data . . . addressing 30 billion daily ad impressions across 800 . . . audience segments."[97]

**F. TripleLift's "Server-to-Server" User Syncing**

129. TripleLift advertises that its TripleLift Audiences product eliminates the reliance on third-party cookies in favor of "First-Party Data" that is somehow more considerate of user privacy.[98] This is false. The exchange of user data has simply moved from the browser to the server, out of view of internet users. Rather than storing and exchanging identifiers on the browser where a user can see them, TripleLift stores and exchanges users' identifiers on its own server out of view.

130. In response to lawsuits like this one and increasing consumer concerns about dragnet tracking via cookies, Defendant began developing ways to continue to surreptitiously track internet users without cookies or other methods more likely to be understood by the general public. This is where "server-to-server" syncing comes in.

131. Although TripleLift may not be saving cookies to users' browsers, it is still collecting their data from publishers' websites and matching it with targeting data from advertisers using what it refers to as "S2S Integrations" ("Server-to-server integrations").[99] "Server-to-server" means that the communication occurs behind the scenes, directly between TripleLift and its advertising partners rather than in web requests from a user's browser.[100] With "Server-to-server" syncing, data is exchanged between TripleLift and its partners without any involvement from the users whose data is being exchanged.

---

[96] *Id.*

[97] *The Results Are In: TripleLift Audiences Provides Superior Targeting and Monetization*, TRIPLELIFT (Sep. 25, 2023), https://triplelift.com/resources/blog/large-scale-test-results-for-triplelift-audiences/

[98] *Id.*

[99] *TripleLift SSP*, TRIPLELIFT, https://triplelift.com/triplelift-ssp/

[100] *Client-Side vs. Server-Side: What's the Difference?*, INDEED, https://www.indeed.com/career-advice/career-development/client-side-vs-server-side

132. This behind-the-scenes data exchange is powered by TripleLift's "User Sync" APIs.[101] TripleLift supports three main scenarios with its User Sync API:

- "for [publishers and advertisers] who want to store their user ID in [TripleLift's] match table"
- "to retrieve a user's TripleLift user ID (TLUID) to store in [an publisher or advertiser's] match table"
- "to retrieve the TLUID and have TripleLift sync with [its] partners".[102]

133. TripleLift's User Sync API enables Cookie Syncing without cookies, allowing advertisers and publishers to synchronize their respective identifiers for a given user such that they may be followed around the internet for improved ad targeting and monetization.

134. In short, TripleLift's business is driven by its ability to de-anonymize users by correlating their IP addresses, Device Metadata, unique identifiers, and web history to profiles that can be sold to advertisers. Advertisers will pay more money to TripleLift for more precisely defined and targetable users, incentivizing TripleLift to collect more data about them. Publishers want to be able to charge more for access to their website visitors, so they send more of their visitors' data to TripleLift to pass along to the advertisers.

135. In both lines of business (with publishers and with advertisers), TripleLift benefits by extracting more data about users and ensuring that users can be identified wherever they go on the web, regardless of any privacy protections the user may employ.

136. As demonstrated above, the process of Cookie-Syncing may be visible to internet users. While Cookie Syncing is typically shown as a "client-side" process, the figure below illustrates how TripleLift utilizes "server-side" data exchange to hide its activities from internet users.

---

[101] *User Sync API Documentation*, TRIPLELIFT, https://docs.triplelift.com/docs/user-sync

[102] *User Sync API Documentation*, TRIPLELIFT, https://docs.triplelift.com/docs/user-sync




137. As demonstrated above, the user of a Client Device can see what information is sent to the Ad Exchange itself, but it cannot see the other servers and companies to which the Ad Exchange sends the user's information.

## III. DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES

138. As demonstrated below, Defendant's TripleLift Tracker is present on each of the websites visited by Plaintiff and several additional websites tested by Plaintiff' Counsel. The Triple Lift Tracker collects information on Plaintiff's and Class Members' interactions with those websites, and assists the Pixel Partners in the wiretapping and surveillance of Plaintiff and Class Members on the subject websites.

### A. Accuweather

139. AccuWeather is website that provides daily weather forecasts and reports.

140. The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

141. Unbeknownst to website visitors, the TripleLift Tracker is loaded onto each page of the AccuWeather website.




142. Defendant, once called to the website, collects the user's device and browser information.


```
},
"sua": {
   "source": 1,
   "platform": {
      "brand": "Windows"
   },
   "browsers": [{
      "brand": "Not)A;Brand",
      "version": ["8"]
   }, {
      "brand": "Chromium",
      "version": ["138"]
   }, {
      "brand": "Google Chrome",
      "version": ["138"]
   }],
   "mobile": 0
```


143. The TripleLift Tracker also intercepts the user's IP address in the manner described above.




144. The TripleLift Tracker also collects the user's precise geolocation in the manner described above.




145. The TripleLift Tracker also acts as an SSP on the Accuweather website, placing bids to target particular users with advertisements. Defendant runs multiple header bidding auctions on the webpage Plaintiff was visiting. Header-bidding auctions are auctions that "occur in real time as

the page loads, which allows all exchanges to submit bids on an ad impression simultaneously."[103] Below is a screenshot of Defendant running a header bidding action during Plaintiff counsel's testing of the webpage.

| Method | Host | Path | Start I |
|---|---|---|---|
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.29.0&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=1000 | 16:31:02.797 |
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.53.2&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=2000 | 16:31:04.634 |
| GET | eb2.3lift.com | /sync | 16:31:09.848 |
| GET | eb2.3lift.com | /sync | 16:31:10.411 |
| GET | tlx.3lift.com | /header/notify?px=1&pr=%24%7BAUCTION_PRICE%7D&ts=1754685064&aid=271648902790425454589608&ec=2662_193860_T23324986&n=GgDyAscCCli92cQGEhc... | 16:31:22.603 |
| GET | eb2.3lift.com | /r?rr=creative&bc=1.375&aid=271648902790425454589608&bmid=2662&biid=6833&sid=193860&tid=23324986&clid=22928323&brid=569632&adid=7736472&cri... | 16:31:22.604 |
| GET | eb2.3lift.com | /pe?fid=11&tid=23324986&peid=4&aid=271648902790425454589608 | 16:31:22.605 |
| GET | tlx.3lift.com | /header/notify?px=1&pr=%24%7BAUCTION_PRICE%7D&ts=1754685064&aid=271648902790425454589608&ec=2662_193860_T23324986&n=GgDyAscCCli92cQGEhc... | 16:31:22.605 |
| GET | eb2.3lift.com | /eee?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&ev=1&eid=5 | 16:31:22.606 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:22.606 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:24.788 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:25.844 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:27.704 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:30.363 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:32.752 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:37.802 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:37.802 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:45.503 |
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.53.2&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=2000 | 16:31:47.904 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:52.758 |
| GET | eb2.3lift.com | /evd?aid=271648902790425454589608&inv_code=Accuweather_Prebid_Web_Outstream&bmid=2662&vlt=2&bypassDuration=true&dmp_ids=ChxodHRwczovL3d3dy5h... | 16:31:52.763 |
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.29.0&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=1000 | 16:32:15.952 |
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.53.2&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=2000 | 16:32:16.893 |
| GET | eb2.3lift.com | /sync | 16:32:22.568 |
| GET | eb2.3lift.com | /sync | 16:32:23.119 |
| POST | tlx.3lift.com | /header/auction?lib=prebid&v=9.53.2&referrer=https%253A%252F%252Fwww.accuweather.com%252F&tmax=2000 | 16:32:36.156 |

146. When running the auction, Defendant ID-synced with several Partner Trackers on the AccuWeather website to send and obtain information about the individual website user. Defendant then adds the collected information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches AccuWeather—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

147. Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

[103] https://www.adexchanger.com/adexplainer/adexplainer-client-side-vs-server-side-header-bidding-whats-the-difference/

148. Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B. Healthline**

149. Healthline is website that publishes articles on health, wellness, nutrition and fitness.

150. The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

151. Unbeknownst to website visitors, the TripleLift Tracker is loaded onto each page of the Healthline website.

**Triple Lift - Post Request**
tlx.3lift.com/header/auction?lib=prebid&v=9.4.1&referrer=https%253A%252F%252Fwww.healthline.com%252Fhealth%252Fdepression%252Fselective-serotonin-reuptake-inhibitors-ssris&tmax=1500&gdpr=false&us_privacy=1YNY
Jan 31 15:39:16 EST 2025

**URL Breakdown:**

| | |
|---|---|
| lib | prebid |
| v | 9.4.1 |
| referrer | https%3A%2F%2Fwww.healthline.com%2Fhealth%2Fdepression%2Fselective-serotonin-reuptake-inhibitors-ssris |
| tmax | 1500 |
| gdpr | false |
| us_privacy | 1YNY |

152. Defendant, once called to the website, collects the user's device and browser information.


```
"device": {
    "w": 954,
    "h": 788,
    "dnt": 0,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/132.0.0.0 Safari/537.36",
    "language": "en",
    "sua": {
        "source": 1,
        "platform": {
            "brand": "Windows"
        },
        "browsers": [{
            "brand": "Not A(Brand",
            "version": ["8"]
        }, {
            "brand": "Chromium",
            "version": ["132"]
        }, {
            "brand": "Google Chrome",
            "version": ["132"]
        }],
        "mobile": 0
```


153. The TripleLift Tracker also intercepts the detailed, full-string URL from each page of the Healthline website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which articles they want to view. In addition, Defendant intercepts "keywords" that act as segment information to add Plaintiff to advertising datasets.

```
},
"ext": {
  "fpd": {
    "context": {
      "domain": "healthline.com",
      "keywords": "treatmentseekers,serotonin,asthma-aq-t1,breast_cancer-aq-t1",
      "publisher": {
        "domain": "healthline.com"
      },
      "page":
"https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris",
      "ref":
"https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris"
    },
    "user": {
      "ext": {
        "consent": ""
      }
    }
  },
  "ortb2": {
    "source": {
      "tid": "A1"
    },
    "site": {
      "domain": "healthline.com",
      "keywords": "treatmentseekers,serotonin,asthma-aq-t1,breast_cancer-aq-t1",
      "publisher": {
        "domain": "healthline.com"
      },
      "page":
"https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris",
      "ref":
"https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris"
```


154. The TripleLift Tracker also acts as an SSP on the Healthline website, placing bids to target particular users with advertisements. Defendant runs multiple header bidding auctions on the webpage Plaintiff was visiting. Header-bidding auctions are auctions that "occur in real time as the page loads, which allows all exchanges to submit bids on an ad impression simultaneously."[104] Below is a screenshot of Defendant running a header bidding action during Plaintiff's testing of the webpage.

[104] https://www.adexchanger.com/adexplainer/adexplainer-client-side-vs-server-side-header-bidding-whats-the-difference/

```
GET eb2.3lift.com
/sync?px=1&src=google&google_push=AXcoOmRJ3Rbf_RV4cNG8HvkWRPgBQufbOVuIwAznacwgCxWS
pHilpLx6EkrclPZ_V357KvWdv8fmlrvGW-ndPij1EBh2SzTGlXs
Jan 31 15:39:07 EST 2025

POST    tlx.3lift.com
/header/auction?lib=prebid&v=9.4.1&referrer=https%3A%2F%2Fwww.healthline.
com%2Fhealth%2Fdepression%2Fselective-serotonin-reuptake-inhibitors-ssris&tmax=150
0&gdpr=false&us_privacy=1YNY
Jan 31 15:39:16 EST 2025

POST    tlx.3lift.com
/header/auction?lib=prebid&v=9.4.1&referrer=https%3A%2F%2Fwww.healthline.
com%2Fhealth%2Fdepression%2Fselective-serotonin-reuptake-inhibitors-ssris&tmax=150
0&gdpr=false&us_privacy=1YNY
Jan 31 15:39:16 EST 2025

GET eb2.3lift.com   /sync?us_privacy=1YNY&gpp=DBABLA~BVVqqqqgCgA.QA&gpp_sid=7&=
Jan 31 15:39:20 EST 2025
```

155. When running the auction, Defendant ID-synced with several Partner Trackers on the Healthline website to send and obtain information about the individual website user. Defendant then adds the collected information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches AccuWeather—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

156. Alongside the bidding auction, Defendant also collects the user's IP address.

| | |
|---|---|
| :status | 302 |
| accept-ch | Sec-CH-UA-Full-Version-List,Sec-CH-UA-Arch,Sec-CH-UA-Model,Sec-CH-UA-Platform-Version,Sec-CH-UA-Bitness |
| access-control-allow-credentials | true |
| access-control-allow-origin | https://www.healthline.com |
| an-x-request-uuid | 57789681-68f7-4fa3-b418-8160a3240502 |
| cache-control | no-store, no-cache, private |
| content-length | 0 |
| content-type | text/html; charset=utf-8 |
| date | Fri, 31 Jan 2025 20:39:16 GMT |
| expires | Sat, 15 Nov 2008 16:00:00 GMT |
| location | https://trc.lhmos.com/prebid/request?auctionStart=1738355956512&url=https%3A%2F%2Fwww.healthline.com%2Fhealth%2Fdepression%2Fselective-serotonin-reuptake-inhibitors-s... |
| p3p | policyref="http://cdn.adnxs-simple.com/w3c/policy/p3p.xml", CP="NOI DSP COR ADM PSAo PSDo OURo SAMo UNRo OTRo BUS COM NAV DEM STA PRE" |
| pragma | no-cache |
| server | nginx/1.23.4 |
| set-cookie | XANDR_PANID=_hz9QhDuvswDqFNrSB10Qqu3YwPk3oAkXB1lJj4y2dYczUDvtTTaLxP5H7AFkf4lGG2g-wNvczulviepCNCVGMuXilGNvbTsMmc90uMz0H0.; SameSite=None; Path=/; Max-... |
| set-cookie | receive-cookie-deprecation=1; SameSite=None; Path=/; Max-Age=314496000; Expires=Fri, 19-Jan-2035 20:39:16 GMT; Domain=.adnxs.com; Secure; HttpOnly; Partitioned |
| set-cookie | uuid2=476255108948676925; SameSite=None; Path=/; Max-Age=7776000; Expires=Thu, 01-May-2025 20:39:16 GMT; Domain=.adnxs.com; Secure; HttpOnly |
| x-proxy-origin | 12.[redacted] 12.[redacted]584.bm-nginx-loadbalancer.mgmt.nym2.adnexus.net; adnxs.com |
| x-xss-protection | 0 |

Headers Set Cookie Raw

157. Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**C. Loan Depot**

158. Loan Depot sells mortgage and lending products. Consumers on Loan Depot's website can acquire a mortgage, personal loans or refinance their current mortgage.

159. The TripleLift Pixel participates in a web of cookie syncing and identity resolution, syncing with over a dozen Partner Pixels onto the Loan Depot website.

160. One of those Partner Pixels is the ADNXS Pixel, owned by Microsoft. The TripleLift Pixel and ADNXS Pixel cookie sync and provide identity resolution regarding the individual website user to each other after the ADNXS pixel is called onto the Loan Depot website.


**GET eb2.3lift.com**
**Tue Aug 08 09:38:00 EDT 2023**
**3 Lift with Google Sync**
**Base64**
MzM2MjU3MDcxOTkwNTgxNDc3MjUyNg==
**Decoded**
3362570719905814772526

**Request:**
:method: GET
:authority: eb2.3lift.com
:scheme: https
:path: /ebda?sync=1&gdpr=0&gdpr_consent=
sec-ch-ua: "Not/A)Brand";v="99", "Google Chrome";v="115", "Chromium";v="115"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/115.0.0.0 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: image/avif,image/webp,image/apng,image/svg xml,image/*,*/*;q=0.8
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: image
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: tluid=3362570719905814772526

**Response:**
:status: 302
date: Tue, 08 Aug 2023 13:38:00 GMT
content-length: 0
location:
https://cm.g.doubleclick.net/pixel?google_nid=tl&gdpr=0&gdpr_consent=&us_privacy=&google_hm=MzM2MjU3MDcxOTkwNTgxNDc3MjUyNg==
cache-control: no-cache, no-store, must-revalidate
p3p: policyref="http://cdn.3lift.com/w3c/p3p.xml", CP="NON DSP COR NID OUR DEL SAM OTR UNR COM NAV INT DEM CNT STA PRE LOC OTC"
set-cookie: tluid=3362570719905814772526; Path=/; Domain=.3lift.com; Max-Age=7776000; Expires=Mon, 06 Nov 2023 13:38:00 GMT; Secure; SameSite=None


161. Milliseconds after receiving the information collected by the TripleLift Pixel, the ADNXS Pixel cookie syncs and trades identity resolution with Defendant by calling the TripleLift Pixel onto the Loan Depot website.

162. The TripleLift Pixel also collects device and browser fingerprinting information as described herein.

163. Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to mental health treatment to the individual—and enriches Loan Depot—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

164. Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**D. Zillow**

165. Zillow's website, zillow.com, is an online resource for real estate renters and buyers nationwide. Website visitors can view listings for specific properties, search for properties in specific geographic areas, and apply to rent or buy specific properties.

166. Unbeknownst to Zillow Website visitors, the TripleLift Tracker is loaded onto each page the Zillow website.

167. As soon as the individual reaches the Zillow website, the TripleLift Tracker loads cookies onto the individual's browser in the manner described above.

**GET eb2.3lift.com /xuid?**
**Mon Jan 13 12:49:43 EST 2025**

**Cookies:**
tluid 2484802096709156186774
tluidp 2484802096709156186774
receive-cookie-deprecation 1

168. The TripleLift Tracker also immediately intercepts the user's IP address in the manner described above.

**Data:**
mid 2319
xuid 0-0ca9aa4f-1d3f-5aec-4632-c6b16a0a5efe$ip$12.[redacted]
dongle 4430

169. The TripleLift Tracker also gathers the detailed, full-string URL from each page of the Zillow website a user visits, thereby intercepting the user's communications with the website regarding which properties in which geographic areas they want to view.

**3 Lift / ZIPCODE Search**
**POST tlx.3lift.com /header/auction?**
**Mon Jan 13 12:49:58 EST 2025**

**Cookies:**
tluid 2484802096709156186774
tluidp 2484802096709156186774
receive-cookie-deprecation 1

**Data:**
lib prebid
v 9.25.0
referrer
https%3A%2F%2Fwww.zillow.com%2Flos-angeles-ca-91344%2F%3FsearchQueryState%3D%257B%25
22pagination%2522%253A%257B%257D%252C%2522isMapVisible%2522%253Atrue%252C%2522map
Bounds%2522%253A%257B%2522north%2522%253A34.2638508685709%252C%2522south%2522%2
53A34.05020773425977%252C%2522east%2522%253A-118.3362753181243%252C%2522west%2522
%253A-118.61265013501882%257D%252C%2522regionSelection%2522%253A%255B%257B%2522re
gionId%2522%253A96370%252C%2522regionType%2522%253A7%257D%255D%252C%2522filterStat
e%2522%253A%257B%2522sort%2522%253A%257B%2522value%2522%253A%2522globalrelevancee
x%2522%257D%257D%252C%2522isListVisible%2522%253Atrue%252C%2522mapZoom%2522%253
A12%257D
tmax 1000




domain 75e878b551f88053132cb7c92a99aa80.safeframe.googlesyndication.com
ref
https%253A%252F%252Fwww.zillow.com%252Fhomedetails%252F11726-Balboa-Blvd-Granada-Hills-CA-91344%252F20110219_zpid%252F

170. The TripleLift Tracker is cookie syncing, providing and receiving identity resolution, and ID matching with numerous Partner Trackers on the Zillow website. The image below shows a sync with the TapAd Pixel, owned by TapAd.

GET pixel.tapad.com
/idsync/ex/push?partner_id=2499&partner_device_id=99e2fa08-188a-4faa-af97-dfb869124302-674f6315-5553&partner_url=https%253A%252F%252Feb2.3lift.com%252Fxuid%253Fmid%253D3646%2526xuid%253D99e2fa08-188a-4faa-af97-dfb869124302-674f6315-5553%2526dongle%253D1fa5%2526gdpr%253D0%2526gdpr_consent%253D
Mon Jan 13 12:49:48 EST 2025

171. This large-scale exchange is in preparation for the real-time servicing of ads on the Zillow website. After collecting (and sharing) as much information as possible on the individual user, Defendant bids on advertising space to target the individual. The image below shows Defendant bidding on a banner ad on the Zillow website.

172. This type of ad facilitation necessarily involves (i) identifying the website visitor (ii) knowing which page the individual is visiting (*i.e.*, intercepting their selection of articles or other content and (iii) sharing previously gathered information about that individual to make the advertisement more attractive to potential bidders.

173. Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described

herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to real estate and specific to the geolocations searched to the individual—and enriches Zillow—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

174. Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

## IV. DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS

### A. Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users

175. As a result of TripleLift's technology being deployed on thousands or millions of websites, Defendant is collecting various forms of personal information and web activity records of nearly every American and sells that data to target advertising.

176. The information collected, on its own, is enough to identify the individual internet user. But this is only the first step in Defendant's practices of dragnet surveillance.

177. With TripleLift's user ID syncing processes, Defendant not only has access to its own information that it tracks from Internet users, but also the information that its partner advertisers track.[105] In this way, TripleLift amasses and aggregates Internet users' data and sells it back to its partner advertisers.

178. TripleLift has a whole suite of identity products for this purpose, and in fact acquired a competitor to enhance its user-identification capabilities.[106] TripleLift also enables companies to target specific people through their product TripleLift Audiences.[107]

---

[105] *User Sync*, TRIPLELIFT, https://docs.triplelift.com/docs/user-sync ; *See also infra* Section I.D-E.

[106] James Hercher, *TripleLift Snags 1plusX for $150 Million, Its First-Ever Acquisition*, ADEXCHANGER (Mar. 21, 2022), https://www.adexchanger.com/ad-exchange-news/triplelift-snags-1plusx-for-150-million-its-first-ever-acquisition/

[107] *TripleLift Audiences*, TRIPLELIFT, https://triplelift.com/data-targeting/

### B. The Partner Trackers Use Profiles Created By Defendant To Enhance Their Advertising And Analytics Services

179. In addition to contributing vast amounts of data to TripleLift's data profiles, the data collected by TripleLift is utilized by both TripleLift and the Partner Pixels to conduct hyper-targeted advertising through the real-time bidding process.

180. The TripleLift identity resolution process is a key part of a complex ecosystem of pixels that deliver detailed user information to advertisers to increase the efficiency of those advertisements.

181. Further, the delivery of advertisements facilitated by TripleLift , involves the sharing of vast amounts of consumer information with Partner Pixels.

182. When TripleLift shares website visitor information with a Pixel Partner, that partner (i) uses the information provided by TripleLift to add information to its own data and advertising datasets and (ii) shares the identity information with other advertisers during the real-time bidding delivery of advertisements.

183. For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

184. This information is provided by the Partner Pixels, who use Defendant's identity resolution services or advertising services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time bidding ecosystem as advertisements are delivered on websites.

185. Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Pixels are paid for the information they have stored about that user. Millions of these bids are made per day across the Internet, demonstrating the immense value of the data Defendant improperly collects on Plaintiff and Class Members.

186. As such, the improper collection of vast amounts of data on Plaintiff and Class Members is done both for Defendant's profit and for the profit of the Partner Pixels.

## PLAINTIFF'S EXPERIENCES

### A. Plaintiff Lisa Tsering

187. In or about March 2025, Plaintiff Lisa Tsering visited the Healthline website while in California and selected various articles to read.

188. Unbeknownst to Plaintiff Tsering, the TripleLift Tracker was loaded onto each page of the website.

189. The TripleLift Tracker collected information about Plaintiff Tsering's device, browser, and tracked her as she navigated through the website.

190. TripleLift provided the Partner Pixels with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Tsering, bolster their own data profiles, and sell her information during the real-time-bidding process.

191. TripleLift also collected information about Plaintiff Tsering, including the webpages he visited, her IP address, and fingerprint information about her device and browser, among others.

192. Defendant compiled this information into a profile on Plaintiff Tsering and added the bolstered profile to TripleLift's suite of data products described above.

193. Defendant also, by using the cookies loaded onto Plaintiff Tsering's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

194. Plaintiff Tsering was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, including data related to insurance, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Gilligan have discovered these facts.

195. Plaintiff Tsering did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, including data related to insurance, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

196. Plaintiff Tsering has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Tsering.

## CLASS ALLEGATIONS

197. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

198. **California Subclass**: Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All California residents whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

199. The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

200. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

201. **Numerosity**. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently; however, it is estimated that there are tens or hundreds of millions of individuals

in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

202. **Typicality**. Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all Class Members, had herr information collected and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiff.

203. **Adequacy**. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

204. **Commonality/Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

205. Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

206. Whether Defendant acted intentionally in violating Plaintiff's and Class Members' privacy rights under the California Constitution or common law;

207. Whether Defendant was unjustly enriched because of its violations of Plaintiff's and Class Members' privacy rights; and

208. Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute;

209. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would

engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion

210. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

211. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

212. Plaintiff brings this claim pursuant to California law.

213. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

214. Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

215. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

216. Plaintiff and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

217. Plaintiff and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

218. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a) Defendant engages in widespread data collection and interception of Plaintiff's and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

b) Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the OpenX products described herein.

c) Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiff's Class Members' common law right to privacy and the control of their personal information.

d) Defendant sells or discloses these profiles, which contain the improperly collected data about Plaintiff and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

219. Defendant's amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

220. In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

221. Accordingly, Plaintiff and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**<u>COUNT II</u>**
**Violation Of The California Invasion of Privacy Act**
**Cal. Penal Code § 631(a)**

222. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

223. Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

224. The California Legislature enacted the CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

225. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted). This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device." *Id*. at 361 (emphasis added). Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

226. Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022). Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-

protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

227. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

228. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, 2022 WL 1744107, at *2.

229. Defendant's Tracker, various pixels and SDKs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

230. Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

231. At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

232. At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

233. Further, Defendant "[a]ids, agrees with, employs, or conspires with" each Partner Pixel that it provides identity resolution to and who intercepts Plaintiff's and California subclass Members' confidential communications.

234. Plaintiff and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass Members' electronic communications.

235. The wiretapping of Plaintiff and California Subclass Members occurred in California, where Plaintiff and California Subclass Members accessed the websites, where Defendant's pixels were loaded on Plaintiff's and California Subclass Members' browsers, and where Defendant routed Plaintiff's and California Subclass Members' electronic communications to Defendant's servers.

236. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

237. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

238. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

239. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

240. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

241. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

242. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

243. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

244. Historically, law enforcement used “pen registers” to record the numbers of outgoing calls from a particular telephone line, while law enforcement used “trap and trace devices” to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. This, combined with the California Supreme Court’s mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies similar to Defendant’s technologies at issue here. *See*, *e.g.*, *Shah v. Fandom, Inc.*, No. 24-CV-01062-RFL, 2024 WL 4539577, at *21 (N.D. Cal. Oct. 21, 2024) (finding trackers were “pen registers” and noting “California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted”); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (“Plaintiff’s allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.”); *Greenley*, 684 F. Supp. 3d at 1050 (referencing CIPA’s “expansive language” when finding software provided by data broker was a “pen register”).

245. The TripleLift Tracker installed on Plaintiff’s and California Subclass Members’ browsers, to the extent they do not intercept “contents” of communications as defined in CIPA § 631(a), are “pen registers” because they are “device[s] or process[es]” that “capture” the “routing, addressing, or signaling information”—the IP address, geolocation, device information, other persistent identifiers, and the destination address of their internet query (the website URL)—from the electronic communications transmitted by Plaintiff’s and California Subclass Members’ computers or smartphones. Cal. Penal Code § 638.50(b); *see also Shah,* 2024 WL 4539577, at *3; *Mirmalek*, 2024 WL 4102709, at *3.

246. At all relevant times, Defendant installed the TripleLift Trackers—which are pen registers—on Plaintiff’s and California Subclass Members’ browsers, which enabled Defendant to collect Plaintiff’s and California Subclass Members’ IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited. Defendant then used the Trackers to

build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiff's and California Subclass Members' data when it is provided to advertisers through the real-time bidding process.

247. Plaintiff and California Subclass Members did not provide their prior consent to Defendant's installation or use of the TripleLift Tracker or its pixels or any other tracking technology at issue.

248. Defendant did not obtain a court order to install or use the TripleLift Tracker, pixels or other tracking technology at issue.

249. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT IV
## Unjust Enrichment

250. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

251. Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

252. In both cases, Plaintiff brings this claim pursuant to California law.

253. Defendant has wrongfully and unlawfully trafficked in the named Plaintiff's and Class Members' personal information and other personal data without their consent for substantial profits.

254. Plaintiff's and Class Members' personal information and data have conferred an economic benefit on Defendant, which was collected and used by Defendant without consent.

255. Defendant has been unjustly enriched at the expense of Plaintiff and Class Members and has unjustly retained the benefits of its unlawful and wrongful conduct.

256. It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

257. Plaintiff and Class Members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained because of its unlawful and wrongful conduct.

258. When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant.

259. Defendant has been unjustly enriched by virtue of its violations of Plaintiff's and California Class members' legally protected rights to privacy as alleged herein, entitling Plaintiff and California Class members to restitution of Defendant's enrichment. "[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." RESTATEMENT (THIRD) OF RESTITUTION § 1, cmt. a.

260. Defendant was aware of the benefit conferred by Plaintiff. Indeed, Defendant's data-brokerage products are premised entirely on the sale of such data to third parties. Defendant therefore acted in conscious disregard of the rights of Plaintiff and Class and California Subclass Members and should be required to disgorge all profit obtained therefrom to deter Defendant and others from committing the same unlawful actions again.

**COUNT V**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

261. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

262. Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the Class against Defendant.

263. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

264. The ECPA protects both the sending and the receipt of communications.

265. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

266. The transmission of Plaintiff's website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

267. The transmission of this information between Plaintiff and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

268. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

269. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

270. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

271. The following instruments constitute "devices" within the meaning of the ECPA:

- The TripleLift Tracker, and any other tracking code or SDK used by Defendant;
- Plaintiff's and Class Members' browsers;
- Plaintiff's and Class Members' mobile devices;
- Defendant and each website's web and ad servers;
- Each Partner Pixel;
- The plan Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

272. Plaintiff and Class Members' interactions with each website are electronic communications under the ECPA.

273. By utilizing the TripleLift Tracker, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

274. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

275. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

276. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

277. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

278. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

279. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

280. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

281. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a) For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes.

(b) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c) For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d) For pre- and post-judgment interest on all amounts awarded; and

(e) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 23, 2025

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*Pro Hac Vice* Forthcoming)
Victoria X. Zhou (*Pro Hac Vice* Forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*